# EXHIBIT 1
# PAGES 1-29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x
                               :
UNITED STATES OF AMERICA       :   No. 3:01CR-205(SRU)
                               :   915 Lafayette Boulevard
                               :   Bridgeport, Connecticut
                               :
        vs.                    :
                               :   December 9, 2003
                               :
GARY FALCETTA                  :
                               :
- - - - - - - - - - - - - - - x

SENTENCING

B E F O R E:

    THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

    FOR THE GOVERNMENT:

        OFFICE OF THE UNITED STATES ATTORNEY
            915 Lafayette Boulevard,  Room 309
            Bridgeport,  Connecticut 06604
        BY:  KARI ANNE DOOLEY, AUSA

    FOR THE DEFENDANT:

        JEROME H. DIAMOND, ESQ.
            19 W. 44th Street
            New York, New York  10036

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
            Bridgeport, Connecticut  06604
            Tel: (203) 246-6385

1              (3:00 O'CLOCK P.`M.)

2         THE COURT:  Good afternoon.

3         MS. DOOLEY:  Good afternoon, Your Honor.

4         MR. DIAMOND:  Good afternoon, Your Honor.

5         THE COURT:  We're here for sentencing in the

6    matter of United States v. Gary Roberto Falcetta.  Could I

7    have appearances, please?

8         MS. DOOLEY:  Your Honor, Assistant United States

9    Attorney Kari Dooley for the government.  With me at

10   counsel table is Special Agent Don Hibbert with the Drug

11   Enforcement Administration.

12        THE COURT:  Thank you.

13        MR. DIAMOND:  Jerome H. Diamond, 19 West 44th

14   Street, New York City, for the defendant Gary Falcetta.

15        THE COURT:  Thank you.  And Chief, excuse me,

16   Deputy Chief United States Probation Officer Warren

17   Maxwell is also in court with us today.

18        On November 9th, 2001, the defendant Gary

19   Falcetta appeared before me and entered a plea of guilty

20   to Count One of an indictment charging him with conspiracy

21   to possess with intent to distribute and distribution of

22   more than one hundred grams of heroin in violation of 21

23   USC, Section 846 and 841(a)(1).  The court accepted the

24   plea of guilty and thereupon entered a finding of guilty.

25   A presentence report was thereafter prepared for the court

1    by the U. S. Probation Office.  The initial report was

2    dated June 27, 2002.  I've reviewed that report, as well

3    as the addenda to the report dated September 6, 2002 and

4    May 5, 2003.  And I've consulted with Mr. Maxwell who is

5    the principal author of the PSR.

6              In addition, I have reviewed the following in

7    preparation for sentencing today:  The government's

8    sentencing memorandum dated October 22; the defendant's

9    sentencing memoranda and omnibus motions as well as the

10   addendum to the sentencing memoranda dated, all dated

11   December 8th; the government's supplemental sentencing

12   memorandum dated December 9th, as well as a variety of

13   exhibits received from the government, including the trial

14   testimony of Mr. Falcetta in the trial of Andre Osorio

15   which I have reviewed in part.

16             In addition, I've spoken with Senior United

17   States District Judge Alan Nevas regarding Mr. Falcetta's

18   testimony at the Osorio trial.

19             Attorney Diamond, have you and Mr. Falcetta had

20   a chance to review the presentence report as well as the

21   addenda to that report?

22             MR. DIAMOND:  I did discuss that with him when I

23   saw him in Rhode Island, Your Honor, and he's aware of it,

24   yes.  And I also discussed it with his young wife who

25   has -- I gave her a copy of the report and she had the

1   reports and I know she was travelling to Rhode Island to

2   see him on several occasions, and he's also communicated

3   with me.

4          THE COURT:  All right.  So, in other words, both

5   you and he have had a chance to review both of those?

6          MR. DIAMOND:  Yes, sir.

7          THE COURT:  The addenda as well as the original

8   PSR?

9          MR. DIAMOND:  Yes, sir.

10          THE COURT:  Okay, good.  And let me inquire

11   whether, putting aside the legal arguments that I know you

12   have regarding the guideline calculation and downward

13   departures and so forth, are you disputing or objecting to

14   any of the factual statements set forth in the PSR?

15          MR. DIAMOND:  No, not the factual -- forgive me

16   if I sit -- not the factual statements but the legal

17   argument.

18          THE COURT:  Yes, all right.  And, Ms. Dooley,

19   has the government had a chance to review the PSR and the

20   addenda?

21          MS. DOOLEY:  It has, Your Honor.

22          THE COURT:  Any objections?

23          MS. DOOLEY:  To the facts, no, Your Honor.

24          THE COURT:  All right, good.  I'm going to adopt

25   the factual statements of the PSR as the findings of fact

1    of the court in this matter.  And, in addition, I'm going

2    to accept the plea agreement dated October 25, 2001 which

3    was filed on November 9, 2001, being satisfied that the

4    agreement adequately reflects the seriousness of the

5    actual offense behavior and that accepting it will not

6    undermine the purposes of sentencing.

7            Let me review the maximum and minimum penalties

8    that Mr. Falcetta faces today.  First, he faces a term of

9    imprisonment under 21 USC Section 846 and 841(b)(1)(b) of

10   a maximum of 40 years and a minimum of five years, a fine

11   of up to two million dollars, a term of supervised release

12   of at least four years and up to life, with a provision

13   that should he violate any term or condition of supervised

14   release he could be sentenced to an additional term of

15   incarceration of up to five years.  And, finally, there is

16   a mandatory special assessment of $100.

17           Do either counsel have any correction to that

18   statement of the maximum and minimum penalties in the

19   case?

20           MS. DOOLEY:  No, Your Honor.

21           MR. DIAMOND:  None.

22           THE COURT:  Okay.  Let's turn to the calculation

23   of the sentencing guidelines, which I know both counsel

24   wish to address, and take up the issues that you have

25   there.  I take it, as an initial matter, that counsel are

1    in agreement that the base offense level here is a 28, is

2    that right?

3           MR. DIAMOND:  Yes, I believe that is correct.

4           MS. DOOLEY:  Yes, Your Honor.

5           THE COURT:  Okay, and we have, as I understand

6    your positions, the two factors that may affect the

7    offense level are the question of obstruction of justice

8    and acceptance of responsibility.  Are there other issues

9    that you wish to address toward the computation of the

10   offense level?

11          MS. DOOLEY:  I don't believe so, Your Honor.

12          MR. DIAMOND:  Well, I have several more.  One

13   would be the restoration of 5K1.  Second would be there's

14   another ground that was raised in the case in Iowa federal

15   court which I just discovered yesterday and have served

16   counsel -- and Your Honor doesn't have it.  It's a matter

17   of U. S. against Egan -- that's a Viennese name, and it's

18   in an United States district court in Iowa, involving a

19   5k2.1 -- I'm sorry, 5k2.0 where there was extraordinary

20   acceptance of responsibility.  In this case --

21          THE COURT:  Actually let me interrupt you,

22   Mr. Diamond, because you're really talking about a

23   downward departure, is that right?

24          MR. DIAMOND:  Yes, I am in respects, sir.

25          THE COURT:  Why don't we first get through the

1    arguments about how the sentencing guidelines should be

2    calculated and then we'll get to the question of

3    downwardly departing from that calculation.

4         MR. DIAMOND:  Would that include, Your Honor,

5    his criminal history?

6         THE COURT:  Yes, we'll turn to that once we're

7    finished with the offense level.  So, as I understand it,

8    the two issues on the offense level calculation are the

9    obstruction of justice and the acceptance of

10   responsibility?

11        MR. DIAMOND:  And the 5k2 also because he's a

12   deportable alien and --

13        THE COURT:  Okay, but that doesn't --

14        MR. DIAMOND:  It doesn't really factor in.

15        THE COURT:  -- doesn't affect his offense level.

16   We'll focus there first and take it one step at a time.

17   Okay.

18        Well, Mr. Diamond, you've in effect requested a

19   Fatico hearing or suggested that you wanted a Fatico

20   hearing with respect to the obstruction of justice

21   questions.

22        MR. DIAMOND:  If required.  And also as to the

23   5K1 which usually they are universally used and I don't

24   know, this is a different -- this a new case, a 2002 case,

25   and I believe it could apply in sentencing but let's see

1    what happens.   Your Honor doesn't have a copy of this, I

2    apologize.

3             THE COURT:  It's all right.   Let's first talk

4    about the question of obstruction of justice and whether a

5    two level enhancement should apply for obstruction of

6    justice.

7             Ms. Dooley, why don't we start with you.  You

8    are urging the court to adjust Mr. Falcetta's offense

9    level upwards by two levels for his testimony in

10   the Osorio case as well as for statements he gave

11   investigators in that case and so forth.  Do you want to

12   make a record?

13            MS. DOOLEY:  If it's okay with Your Honor I

14   think as I read Mr. Diamond's request, he's basically

15   asking the government to establish the facts upon which it

16   believes an obstruction enhancement is appropriate, and

17   frankly it's the same conduct which the government has

18   withdrawn its recommendation for acceptance of

19   responsibility and would ask this court not to award

20   acceptance of responsibility.  And so, in that vein, if

21   Your Honor doesn't mind, I would simply proceed with

22   providing the court with what I believe establishes a

23   series of events and this defendant's conduct, and if at

24   any point in my presentation the court would ask me to

25   proceed via a different mechanism, I'm happy to do that.

1    THE COURT:  All right, that's fine.

2    MS. DOOLEY:  As a preliminary matter, Your

3    Honor, the government relies least of all on this

4    defendant's trial testimony.  We do believe, and so I'm

5    going to focus there for just a moment, because we really

6    do think that's the crux of the problem here, I do believe

7    and I think that the evidence would establish that he

8    purposefully minimized Osorio's role in this conspiracy

9    and that, in so doing, he did perjure himself at the

10    initial trial during direct examination in a substantive

11    fashion.

12    For example, Mr. Falcetta testified that he did

13    not recall who carried the drugs from the Jeep where the

14    drugs were delivered to the blue Stanza in which they were

15    driven to Connecticut.

16    The other testimony established fairly

17    conclusively that it was Mr. Osorio who in fact carried

18    those drugs from the Jeep to the Stanza, and normally the

19    government would say, well, if he didn't remember that

20    particular detail, that's not a big deal, that's okay.

21    But what we found out after the trial -- and I'll get to

22    this conduct in greater detail, is that after his first

23    pretrial prep session with the government, when he was

24    advised to have no further contact with Mr. Rieny (ph),

25    talk to nobody about the case and to let us know if

1  anybody attempted to contact him to tamper with his

2  testimony, he immediately conveyed to Mr. Fandino (ph)

3  that the government had all kinds of evidence against

4  Mr. Osorio and that Mr. Osorio should plead guilty.

5       Now, the government believes that this was part

6  of the defendant's very ill conceived plan to work both

7  sides of this case.  Try get his 5K by keeping the

8  government happy, and in trying to get Mr. Osorio to plead

9  guilty, take responsibility so he doesn't have to testify

10 and Mr. Osorio is happy because nobody's testified against

11 him.  But the evidence that he told Mr. Fandino that we

12 had was then conveyed immediately to Osorio's counsel and

13 I know that because I got a letter from Osorio's cousel

14 demanding its production and I have -- I guess I'll mark

15 it as Government's Exhibit One, Your Honor, a copy of the

16 letter that I received from then counsel for Mr. Osorio,

17 Alan Lawrence Brenner.  He tells him not only do we have

18 Mr. Osorio on tape talking about heroin but we have a

19 photograph of Mr. Osorio carrying the heroin from the Jeep

20 to the Stanza.  But he testified he didn't remember who

21 carried the drugs, but when he's trying to work both sides

22 of the case, he says we've got a photograph of the very

23 event he later claims under oath he doesn't recall.

24      Mr. Falcetta's testimony was, by all standards,

25 a complete disaster for the government's case, but it

1    wasn't because he had given prior sworn inconsistent

2    statements to two investigators.  It's because he didn't

3    fully apprise the government of all of his contacts with

4    Mr. Rieny, of all of the attempts that were made to tamper

5    with him, of everything that he had said to the

6    investigators.  He failed to inform the government, he

7    failed to inform his lawyer, and so when the government

8    had to make an assessment as to whether to use him as a

9    witness based on the information he had provided to us,

10   which was ten percent of what has later claimed to be the

11   truth, he didn't provide it.  So we made a decision based

12   on a tenth of the information that he was obligated to

13   provide to us and it turned out, as Your Honor knows, to

14   be a bad decision because he got completely shredded and

15   his credibility was established for what it is, zero,

16   through cross examination.

17          And that's sort of the trial side of the

18   government's case, Your Honor.

19          What's more troubling is the actual contact.

20   Your Honor has seen a 302 of Mr. Falcetta in an interview

21   much after the fact.  Your Honor has seen his trial

22   testimony, and the two bear absolutely no resemblance to

23   each other.  This defendant on the Thursday before this

24   trial began was given -- for the first time says that he

25   met with investigators.  First he says he didn't tell them

1    anything different than what he had previously told us.

2    Then he admits, well, the statement may be a little bit

3    different.   Three days later he tells, well, there was a

4    second investigator and I might have signed something.   He

5    never discloses that he called the other cooperators a

6    liar.   In fact, from a review of the documents it looks

7    like he only called Shaun Evans a liar.   I don't know that

8    he called the investigator a liar.   He doesn't disclose

9    the full extent -- excuse me, I lost my train of  thought.

10             THE COURT:  You're talking about inconsistencies

11   between the trial testimony and the statement given --

12             MS. DOOLEY:  What I'm talking about is

13   substantively his contact with the investigators, as we

14   stand here today we don't know what, we don't know if he

15   was complicitous in Mr. Osorio's case in an attempt to

16   tank the government's case.   We don't know whether he was

17   coerced.   He was given the opportunity the Sunday before

18   trial, he was given multiple opportunities during the

19   trial under oath to tell the story of how these

20   inconsistent statements came to pass, to tell the story of

21   coercion, to tell the story of duress, to say that they

22   told him you don't need your lawyer, and he didn't do it.

23   He did some of it in pretrial but then on the stand,

24   nothing.   But what he testified to at trial was

25   inconsistent with what he told us before trial.   What he

1   told us after the trial was inconsistent with what he

2   testified to in the trial, and what he told Agent

3   McPhilips (ph) months later bears no -- very little, I

4   shouldn't say no, but very little similarity to what he

5   described to the government, to what he described to the

6   jury, to what he described at the trial. So with all of

7   these statements, some of them under oath, some of them

8   not under oath, all over the map, we have no idea -- but

9   we do know this defendant made a concerted effort, a

10  decision -- could it have been the stupidest decision of

11  his life? Could he be a person of really limited

12  intelligence when it comes to making the right decision in

13  terms of his own, what's in his own best interests?

14  Perhaps. But these were his choices. And the

15  ramification of those choices had been spelled out to him

16  six ways from Sunday. All you have to do is tell the

17  truth. All you have to do is tell us what happened. But

18  he didn't. He tried to work both sides of this case.

19          What this defendant has demonstrated through the

20  meetings with the investigators, through the signing and

21  swearing to false statements, even, for example, even the

22  interview he gave to Agent McPhilips, he says I told that

23  second investigator I refused to sign. Well, did he know

24  that we could get the -- did he know that that second

25  investigator was wearing a recording device? No. Did he

1  know we would be able to access the interview where he

2  doesn't provide any resistence whatsoever to signing and

3  swearing to that document, that he enforces wholeheartedly

4  the previous statement that he'd made exculpating Andre

5  Osorio? That while there appears to be some manipulation

6  on the part of the investigator, he does volunteer that

7  the other cooperating codefendent will say anything to get

8  out of trouble. Does he know he's talking to the defense

9  camp? Does he know he's under a cooperation agreement?

10  He has a lawyer. He's agreed to tell the truth. He has

11  all of the necessary information to make the right

12  decision and he didn't. And in so doing, he significantly

13  undermined the government's ability to prosecute Andre

14  Osorio. That trial was tainted and the government didn't

15  know it and it was tainted by its own witness.

16         For those reasons, Your Honor, the government

17  believes that it has established that through the course

18  of conduct of giving a false exculpatory sworn statement

19  to a codefendent is sufficient to establish obstruction of

20  justice.

21         I would offer, Your Honor, what has previously

22  been provided to both Mr. Diamond and the court, what are

23  Government's Exhibits 2, 3 and 4. Exhibit 2 is the twice

24  signed, once sworn to statement given first to Private

25  Investigator Kevin Higginston (ph) by the defendant; sworn

1    to by the investigator, Les Wolfe (ph).  That's Exhibit 2.

2              Exhibit 3, Your Honor, I would ask that be filed

3    under seal.  It's an FBI 302.  Redacted from it is this

4    defendant's personal identifying information, his social

5    security number, his birthdate, but because it is a 302

6    that was generated in the course of an ongoing

7    investigation, I would ask that be filed under seal.

8              And Government's Exhibit 4, Your Honor, is the

9    transcript of the interview between Mr. Wolfe and this

10   defendant during which the defendant again provides false

11   exculpatory statements about Andre Osorio.

12             I believe, Your Honor, that these documents,

13   coupled with the defendant's own admissions and his trial

14   testimony, are sufficient for this court to make findings

15   that he has not only intentionally, with the specific

16   intent to do so, obstructed justice and that he has also

17   not accepted responsibility by virtue of post-plea

18   essentially criminal conduct.  That would be justified

19   basis for the court not to give him credit for acceptance

20   of responsibility.

21             THE COURT:  Mr. Diamond, let me hear from you.

22             MR. DIAMOND:  Yes, thank you so much, Your

23   Honor.  I almost forgot that one of the other grounds that

24   I think is also essential is the fact that unless my

25   computations are erroneous, and they could be, my client

1    is facing something like ten years of incarceration

2    whereas the prime player, if I use that word properly, in

3    this sort of failed conspiracy, the ball player got 18

4    months.  I found that to be outrageous and through no

5    fault of mine or the court's or anyone else's, I frankly

6    just do not understand it.

7           I also should add that Mr. Osorio pled to a

8    misdemeanor which means he'll get a year or under with

9    Your Honor's approval because I guess you'll be sentencing

10   him, and all the other principals got two years or less.

11          THE COURT:  Of course, each one of those

12   situations --

13          MR. DIAMOND:  Could be different but --

14          THE COURT:  Unfortunately, you know, we're in a

15   world of the sentencing guidelines and, you know, if I

16   were doing what I wanted to do in this case, in these

17   cases, the results might well be different in these cases

18   but I've got to apply the law.

19          MR. DIAMOND:  Your Honor, I had indicated in my

20   sentencing memorandum a rather extensive, certainly not

21   extensive overview of how some very important federal

22   judges feel about the sentencing guidelines, including the

23   Chief Justice of the Supreme Court of the United States,

24   Mr. Renquist.  None of us are perfect.  It is an attempt

25   to try to establish some uniformity in sentencing.  I

1  believe in this respect in some cases it has failed

2  abysmally, and I cannot conceive of this gentleman who for

3  better or worse, having this sole aberration in his life,

4  who never did anything else involving moral turpitude is

5  facing so extensive a sentence, but that is the issue and

6  let me address myself to the issue.

7       The defendant in this case, Your Honor, is Bill

8  Rieny, not Mr. Falcetta.  Look what happened.  You have a

9  group of kids on 83rd Street who all grew up together.

10  Mr. Osorio and Mr. Falcetta knew each other for 20 years.

11  They -- in other words, from six years up they were in

12  each other's homes.  The families knew each, okay?

13  Everything was a world in -- Jackson Heights as a little

14  bit different perhaps than the world you grew up in.

15  Certainly is very far different from the world that I grew

16  up in.  In any event, the single solitary factor that this

17  man had the courage to testify against probable his best

18  friend indicates what his moral fiber really is, but let's

19  go back even further.

20       This case first came about, this failed

21  conspiracy -- Mr. Osorio was obviously guilty.  At the

22  beginning of the case I told my client you must tell the

23  truth and you must go before this court, and he indicated

24  to Agent Hibbert and to Jim Finnerty and to me, yes, I did

25  it, I was guilty, and Osorio was involved and he gave

1    everything.  He disclosed everything.  At which time, Jim

2    said to me, you've got a 5K1.  This doesn't happen in --

3    this is not sudden history.  I remember that very clearly.

4    From that point on I knew nothing about the case other

5    than he had some problems with seeing his young wife who

6    obviously had great concern about the fact that he was

7    testifying or could testify against the 83rd Street Gang.

8    You must understand that Bill Rieny is some type of

9    control freak that has operated in the very, very unusual

10   way of the 83rd Street where he had to go to see his, his

11   wife and his two young children.  Fine.  For over 20 times

12   Mr. Rieny, every time he would come and see him would grab

13   him and say keep -- this is the light motif of the case --

14   keep Andre out of the case, keep Andre out of this, keep

15   Andre out of this.  No matter which way it was said, and

16   the record on 302, 303, keep Andre, keep him out of this,

17   I don't care how you do it, keep him out of it.  That was

18   the whole thing.  That was the entire case.

19           Now, you may use different words, you may have

20   different scripts, you may have different manners of doing

21   this, but that was the light motif of this case.  At the

22   time that this lawyer, who I never met, who went by the

23   name of Brenner who apparently never contacted me and

24   never said, listen, I want to get a statement from your

25   client, I never heard of the man, I never saw him.  What

1   he did was unethical, no question about that.  He hired

2   two private detectives.  Prior to that, Mr. Rieny and a

3   friend of, so-called friend of Gary's, Sam Fandino, went

4   to Falcetta's house.  Here are the statements, sign them.

5   The very statements that I've seen for the first time in

6   court, here they are, sign them.  He signed them.  He

7   shouldn't have signed them.  This was the sole mistake

8   that he has made.  This is the reason why this case is

9   here and there's no other reason.  From that time on, it

10  was impossible for the government, no matter how capable

11  Ms. Dooley is, and I'm sure she's very capable, to win the

12  case.  You had a prior inconsistent statement or

13  statements sworn to by two very capable private

14  detectives.  Les Wolfe is known for this.  He was almost

15  indicted as a member of the police department many, many

16  years ago.  There was a big investigation, big hulking

17  guy, very powerful looking, very persuasive.  They had

18  Gary going every way possible.  The moment those

19  statements were signed, he was dead in the woods and there

20  was no way the government could possibly win their case.

21          However, what happened, just fast forwarding to

22  a time that we were called for preparation, until then I

23  knew nothing about Gary and nothing about everyone else.

24  Sitting around with Kari Dooley, Jim Finnerty, me and Gary

25  and all of a sudden Gary says Osorio had nothing to do

1    with it.  I said what is this?  Ms. Dooley came and said,

2    listen, you'd better talk to your client.  I talked to him

3    and he told me, I said you're going to blow your case.

4    This is ridiculous.  They are going to take away your 5K1,

5    your cooperation and everything.  Tell the truth, okay?

6    He said my wife and children come first.  That's the words

7    he used.

8            At that point, Your Honor, we went back in and

9    he divulged for the first time that there was this

10   statement that was signed -- I don't know if it was one

11   statement or two statements -- that he'd been approached

12   by private detectives.  I fell through the floor.  I was

13   shocked.  I said how is this possible?  It was possible.

14   It happened.  And then slowly we began to understand the

15   enormous coercion, the enormous way that they worked him

16   over.  He was victimized by these people.  Do you realize

17   what it was for his wife to go on 83rd Street and have all

18   the guys there, this gang look at her?  This is Jackson

19   Heights.  People disappear in that neighborhood.  She was

20   fearful, extremely fearful.  This was the type of coercion

21   that he could not resist at that time.

22           THE COURT:  Were there specific threats made

23   either against Mr. Osorio or against his family?

24           MR. DIAMOND:  Only his -- you mean against Mr --

25           THE COURT:  Excuse me.  Falcetta or his family,

1    sorry.

2         MR. DIAMOND:  His wife is the only one that was

3    available.  He was threatened in jail.  He was threatened

4    in jail but that was, I believe, after -- he was

5    registered as a snitch.  The word in spanish is sappo (ph)

6    which means frog, person who talks, an informant.  You can

7    not do that in the Hispanic world, in the Colombian world.

8    In Jackson Heights you get killed for that and your family

9    is at risk as well.  They disappear.  Everyday in the

10   paper, you read the papers about people disappearing.  It

11   happens.

12        At that point, Your Honor, he was extremely

13   fearful, more for his family than for anyone else.  Yet in

14   an act of heroism he went and he testified against his

15   very best friend in court.

16        Now, everything that Kari Dooley said was

17   correct, except she mischaracterizes everything.  He

18   wasn't trying to work for his 5K1, he was trying to avoid

19   testifying against his best friend.  That's what he was

20   doing.  He wasn't thinking about his 5K.  He's not a

21   professional with this.  What he wanted to do was avoid

22   testifying, but at the last instant he testified and who

23   was in court, Your Honor?  The whole 83rd Street Gang was

24   in court, sitting in the courtroom just like these people

25   here, and you know what?  Remember "The Godfather," Your

1    Honor, the scene when they brought in the brother from

2    Sicily and the -- I forget his name, Che Che or whatever

3    his name was, was going to testify on behalf of the

4    government, and all of a sudden he shut up?  Well,

5    Mr. Falcetta looked and he saw those people there, he knew

6    he was finished in that neighborhood.  He knew his wife

7    and his kids were finished.  These two little girls here,

8    Your Honor, their lives were in danger too.  Yet he

9    testified on behalf of the government and he testified

10   poorly.  I admit it.  He forgot about what happened with

11   the drugs.  He didn't do this right.  He didn't do that

12   right.  But there was one thing he was absolutely clear

13   on, Your Honor, and that was keep Osorio out of it.

14            Now, he can do that in many ways.  You can say

15   he was on the moon, he never showed up, we were going to

16   the beach, whatever it was.  Keep Osorio out.  And he

17   testified in favor of the government.  The government has

18   no right to have this individual who's been victimized,

19   who stands to get a very, very severe sentence,

20   characterized as someone that is deserving of an upward

21   modification.  Thank you, sir.

22            MS. DOOLEY:  Your Honor, may I respond briefly?

23            THE COURT:  Please.

24            MS. DOOLEY:  A couple of Mr. Diamond's remarks

25   really highlight the problem that the government sees as

1    making the upward adjustment appropriate.  The contacts

2    between Rieny that he describes -- for example,

3    Mr. Falcetta described in his interview with the FBI that

4    at the first meeting he testified that he ran into, just

5    ran into Rieny when he first contacted, was made to try to

6    talk to him about his testimony and he repeated that on

7    cross and he repeated that on redirect.  In the interview

8    with the FBI, he says that Rieny would park his van in the

9    lot and he would flash his lights at you if he wanted to

10   talk to you.  That could be characterized as sort of a

11   coincidental bumping into but it sounds less so when it

12   starts that way.

13          Most significantly, Your Honor, he says Andre

14   Osorio was there.  The first time he was contacted and

15   told we have to fix this, you can keep Andre out of this,

16   you have to keep Andre out of this, the initial contact,

17   the defendant that was on trial was at that meeting,

18   according to this 302.  That is of enormous significance

19   to the government.  It would have, had we known, impacted

20   the evidentiary arguments that we were making before Judge

21   Nevas.  The government was precluded from going down

22   certain avenues with Mr. Falcetta's testimony because we

23   couldn't tie back the tampering to the defendant, and

24   unless we were able to do that, the judge wasn't going to

25   permit us to offer certain testimony, which he didn't.

1    And that type of withholding of significant information is

2    what put the government in such an adverse -- such a

3    difficult position at trial.

4              I think Mr. Diamond just said there were times

5    that Mr. -- everytime he went to see his wife and kids,

6    Rieny was there.  He was there, he was there, he was

7    there.  That is nowhere in his pretrial prep.  It is

8    nowhere in his trial testimony.  His trial testimony, I

9    went through yesterday, I think he describes one

10   coincidental meeting, a couple of calls, a meeting at his

11   work and a meeting after one of the private investigators.

12   When asked over and over and over again, under oath, did

13   you hear from him, did you talk to him, did he, did he

14   call you?  He might have, I don't know, I don't remember.

15   He was given every opportunity to describe his

16   victimization and the tampering and he didn't do it.

17             Had he done that, if in fact it's the truth, and

18   as I stand here, as I said earlier there have been so many

19   versions I don't know what's true or what isn't, the

20   pressure put on this defendant and his family by

21   Mr. Rieny, but if in fact he had done that, it would have

22   drastically altered, in the government's view, the jury's

23   view of this defendant's testimony.  If they knew what he

24   is now claiming to be the truth, maybe they would have

25   credited his direct testimony.  If he had testified even

1  consistently with what he told us beforehand, the jury

2  might have credited his testimony to a greater extent, but

3  he didn't even do that.  And unless this defendant is

4  incapable of identifying and speaking the truth, if the

5  truth is just a fleeting concept for him and it becomes

6  whatever he can convince others it is, then there is no

7  excuse.  And, unfortunately, there are ramifications.

8        The government is often criticized for not

9  enforcing their cooperating agreements, for not going over

10  cooperators who may use drugs or otherwise breach their

11  plea agreements, who breach their cooperation agreements,

12  and the message has to be sent, we will, even if you

13  testify, even if we make the determination to use you as a

14  witness, if you breach your cooperation agreement by

15  lying, not only will you not get a substantial assistance

16  motion but you will be subject to whatever other penalties

17  attach to that conduct.  And that's a message the U. S.

18  Attorney's office has to send and it's a message that we

19  believe the court should recognize as an appropriate one

20  to send through an appropriate sentence.

21        THE COURT:  Let's turn to the question, the

22  related question of acceptance of responsibility.  In the

23  event that I conclude or find that there has been

24  obstruction of justice here, my understanding of the law

25  is that I'm not required to subtract or, I'm not required

1   to find that acceptance of responsibility points should

2   not be awarded to Mr. Falcetta.  I think the 2nd Circuit

3   has acknowledged that typically, and in the Sentencing

4   Guidelines themselves indicate in application note that

5   ordinarily finding of obstruction of justice will result

6   in a loss of acceptance of responsibility points.  The 2nd

7   Circuit seems to suggest that in the extraordinary case,

8   that's not true.  And it occurs to me that the obstruction

9   of justice here is quite unusual from the ordinary case in

10  that it was not directed at helping Mr. Falcetta himself.

11  Typically, obstruction of justice is a materially false

12  denial of relevant conduct.  It is a false denial of

13  assets sufficient to pay a fine.  It is conduct that

14  implicates the culpability or somehow affects the sentence

15  of the defendant himself.  I haven't heard the government

16  suggest that's the case here, that the claimed obstruction

17  was aimed not at Mr. Falcetta helping himself but rather

18  at helping Mr. Osorio.

19          Starting with that premise, does the government

20  want to comment on whether for that reason and in light of

21  the at least perceived coercion that Mr. Falcetta and his

22  family felt, whether this case might be a case in which

23  even if there's a finding of obstruction of justice there

24  might also be a finding of acceptance of responsibility?

25          And I'd be interested in hearing the

1    government's comments as well on the timeliness and

2    sincerity of Mr. Falcetta's decision to plead guilty.  My

3    sense, frankly, is that he pled guilty relatively early,

4    that he was willing to cooperate and that he has not even

5    since the beginning sought in any way to suggest that he

6    is not in fact guilty of the charges that he pled guilty

7    to.  So if that understanding is incorrect, I'd be

8    interested in hearing that as well.

9        MS. DOOLEY:  No, I think that is correct, Your

10   Honor.  Starting with your last point first, I have not

11   seen or heard anything that this defendant has ever

12   disavowed his guilty plea or his involvement in this

13   conspiracy.  That is quite true.

14        In terms of whether or not the obstructed

15   conduct was aimed at helping the defendant, with the

16   exception of the providing of false information about the

17   government's case and its evidence to Mr. Fandino for

18   delivering back to Mr. Osorio, I think that that's true.

19   I think that particular deception was designed to try to

20   at a very desperate point in the process salvage his 5k1.1

21   because I think he feared quite accurately that his

22   duplicity was about to be discovered if this case went to

23   trial, which of course it was.  That is frankly a small

24   measure of the conduct in which the government relies on

25   for the obstruction enhancement.

1          So in large measure you are correct that the

2     obstructive conduct was to benefit Mr. Osorio, that is

3     correct.  And you're also quite correct that the 2nd

4     Circuit has recognized there are certain instances where

5     acceptance of responsibility credit can be given at the

6     same time an obstruction of justice enhancement is

7     applied.  They are rare circumstances.  They are unique to

8     their own facts.  The government -- I have personally had

9     cases where I have made that recommendation.  The case law

10    I think is also clear though that post-plea conduct can be

11    a basis upon which the court can exercise its discretion

12    frankly to not award acceptance of responsibility.

13          THE COURT:  Sure.  I certainly recognize that

14    the conduct here, which I don't think is really disputed

15    factually, is sufficient ground for me to exercise

16    discretion to deny acceptance of responsibility points.

17    There's no question about that.  The question is really

18    whether under I think the fairly unique circumstances of

19    this case those points should be awarded or not.

20    Mr. Diamond, do you wish to comment?

21          MR. DIAMOND:  Yes, I just want to reinforce Your

22    Honor's observations.  The main reason, outside of the

23    obvious fact that my client was guilty, in pressing for an

24    immediate avowal of his criminal activities was the fact

25    that he was susceptive to being deported and I wanted

1    immediately to get the cooperation of the U. S. Government

2    to write a letter to the Immigration, and I had spoken

3    with Jim Finnerty about that and he agreed with me.  There

4    was some communications in writing between Ms. Dooley and

5    actually Jim Finnerty and myself to the effect that he

6    would write a letter of recommendation to Immigration

7    because I was mainly concerned, and as I have indicated in

8    my memorandum, this case in one respect appears to be,

9    well, giving a person two years, three years, four years

10   five years before you exile him is obviously far more

11   severe, and this is something under the new law and what's

12   happening in this country that is a distinct possibility

13   and I'd urge that in my 5K2 application which I guess we

14   haven't gotten to yet --

15            THE COURT:  Yes, and as I understand it,

16   Mr. Diamond, Mr. Falcetta is not really disputing the

17   factual statement that Ms. Dooley has outlined in terms of

18   what it is he did in connection with his testimony, the

19   statement he made, the statement he made to law

20   enforcement, the statements he made to the investigators

21   and so forth.  You're not -- you don't believe that we

22   need to put on evidence to decide those factual issues, do

23   you?

24            MR. DIAMOND:  Well, my main observation, Your

25   Honor, are two-fold.  Number one, the statements that were