# EXHIBIT 1
# PAGES 30-58

1      made were not made for the purpose of disingenuousness,

2      they are not made -- although they may have changed the

3      current only in one direction, and that was although he

4      may not have recalled every single meeting, the fact that

5      there may have been some -- I can't even use the word

6      insincerity -- it was not done purposely.  He's not a

7      professional witness.  That his memory may have been

8      jogged more than he did at the time, he may not have been

9      properly prepared.  I was only at one meeting with the

10     government and I believe, and maybe I'm wrong, Ms. Dooley

11     indicates quite honestly we don't know what he meant.

12     That's not proven by a point of evidence that he's guilty

13     of anything except testifying, she says, poorly.  I said I

14     don't know.  All I know is that on the stand perhaps he

15     could have gone into more detail as to what happened with

16     the investigators and what happened with Rieny.  He

17     didn't, but was he asked the proper questions?  I don't

18     know.  Would Judge Nevas have done this differently?  I

19     just don't know.  But there are 2nd Circuit cases of

20     preponderance and also of clear and convincing and,

21     moreover, I should indicate that the statements -- well, I

22     don't think that's really that material.  The statements

23     he made to Fandino, he believed that Fandino was his

24     friend.  I believe that my client unfortunately is

25     extremely naive, thought that the 83rd Street Gang was

1    looking out for him when they were only looking out for

2    Mr. Osorio and he was deceived in that regard.

3         In this case he's been deceived all along with

4    everything that's happened in this case.  If he had come

5    to court and not said a word, he'd be in better shape.  Do

6    you realize how going and testifying about his very best

7    friend, which I believe he did not do because he wanted to

8    save his 5K1, that's too sophisticated an observation for

9    him.  He did it because he didn't want to testify against

10   him seeing the enormous peer pressure of having the gang

11   sitting there looking at him.  He was a fink, he's a

12   sappo.  He was someone who was less than dirt.  And

13   because of that, he's been ostracized, his family has been

14   ostracized.  He's running the risk of being killed in

15   jail.  Who knows what will happen to him.  The worst thing

16   he could have done, and I say this with a certain amount

17   of jest, was agree to cooperate in the first place.  He

18   couldn't have come out worse.

19        I, frankly, after practicing for 46 years, don't

20   have any answers at all, but all I can tell Your Honor is

21   if this happened 40 years ago this man would get a one

22   year sentence.  What has happened?

23        THE COURT:  All right.  Well, let me make a

24   ruling on these issues.  First off, I find that the facts

25   as outlined by Ms. Dooley are entirely accurate, and

1    rather than simply restate them I'm going to adopt the

2    statement of the facts regarding Mr. Falcetta's conduct in

3    connection with statements to the investigator, statements

4    to the government and testimony at trial that she has laid

5    out.  And as a result of those findings, in my view

6    Mr. Falcetta did indeed make a materially false statement

7    to a law enforcement officer that significantly obstructed

8    or impeded the prosecution of the instant offense, meaning

9    one of his codefendents, Andre Osorio, who went to trial

10   before Judge Nevas.  I spoke with Judge Nevas about that

11   testimony and though I'm not relying heavily on what he

12   told me, because he tried that case as a courtesy to me,

13   the case had been assigned to me but my schedule did not

14   permit me to handle that trial, I did want to hear his

15   impressions of Mr. Falcetta's testimony, and his view was

16   in essence that Mr. Falcetta's testimony was entirely

17   incredible and that it had a significant negative effect

18   on the prosecution's ability to obtain a conviction

19   against Andre Osorio.  I don't think there's any doubt and

20   certainly I find that the statements, the false,

21   materially false statements made to the government by Mr.

22   Osorio -- excuse me, by Mr. Falcetta concerning Mr. Osorio

23   were willful and they were intended to obstruct the

24   government's prosecution of Mr. Osorio; that is, they were

25   intended to help Mr. Osorio beat the charges against him

1    and, accordingly, based on these findings, I conclude that

2    the two level enhancement for obstruction of justice under

3    3C1.1 applies.

4         MS. DOOLEY:  Your Honor, could I ask that your

5    findings include not only statements to law enforcement

6    but false statements signed and sworn to for the private

7    investigators as being part of the obstructive conduct?

8         THE COURT:  Yes, I agree that these did in fact

9    obstruct and impede the prosecution of Mr. Osorio as well,

10   and that they were materially false.

11        Notwithstanding that finding, I am going to

12   award Mr. Falcetta three points for acceptance of

13   responsibility.  In my view this is an extraordinary case

14   and is one of those very rare cases where the obstruction

15   of justice enhancement does not deprive Mr. Falcetta of

16   his acceptance of responsibility essentially for the

17   following reasons:

18        As I mentioned before, I think this is the very

19   rare case in which the obstruction of justice had

20   essentially no positive impact or potential for positive

21   impact on Mr. Falcetta's own sentence.  This is not a

22   situation where he sought to minimize his conduct.  He has

23   timely accepted responsibility, timely pled guilty, timely

24   indeed sought to cooperate on behalf of the government.

25   He has never minimized his conduct.  He has never sought

1    to avoid responsibility for any aspect of what it is that

2    he did, and his obstructive conduct was aimed at assisting

3    a friend in avoiding similar fate and I think that is the

4    extremely rare case.

5         I also acknowledge that there was some pressure,

6    coercion, that was perceived.  Whether -- whether that's a

7    reasonable excuse is not an issue that I need to reach but

8    I do acknowledge that it was present and that it

9    contributed to the conduct that I found to be obstructive.

10         And for all those reasons, I believe that this

11   is an extraordinary case and warrants a three level

12   reduction for acceptance of responsibility,

13   notwithstanding the fact that there's a two level

14   enhancement for obstruction of justice.

15         So that leaves us with the following sentencing

16   guideline calculation of the offense level here:  Base

17   offense level of 28, a two level enhancement for

18   obstruction of justice, less a three level adjustment for

19   acceptance of responsibility, resulting in a total offense

20   level of 26.

21         Let's turn now to the calculation of

22   Mr. Falcetta's criminal history.  We have what amounts to

23   a motion for downward departure along a horizontal axis

24   under Guideline Section 4a1.3 under the argument that the

25   criminal history category score of three significantly

1    over-represents the seriousness of Mr. Falcetta's past

2    criminal conduct and the likelihood that he will engage in

3    future criminal conduct, and I certainly agree that a

4    level three overstates Mr. Falcetta's criminal history

5    significantly, as well as the likelihood of his

6    recidivism.  The question, it seems to me, is whether in

7    departing from a level three, we stop at a level two and

8    go all the way to a level one.  The law in the 2nd

9    Circuit, as I understand it, is that I am to in effect

10   pause at each level as we go along and decide whether or

11   not that level adequately reflects the seriousness and the

12   likelihood of recidivism, and let me make the following

13   observations and ask counsel to comment on them.

14        First, with respect to the two criminal history

15   points that result from the fact that Mr. Falcetta engaged

16   in the present offense while he was under a term or a

17   sentence, specifically the one year period of unsupervised

18   probation that was subject to paragraph 38 of the PSR,

19   it's my observation that those two criminal history points

20   most likely overstate the seriousness of the timing of

21   this current offense because the probation here was

22   unsupervised and in my mind it is a less serious deviation

23   to have engaged in this conduct while on unsupervised

24   probation than during a supervised probation, either

25   probation or supervised release where the defendant is in

1    fact reporting and is under stricter conditions and so

2    forth.  So those two points I think need to be addressed.

3         The second observation I would make is that the,

4    the two DUI convictions for which Mr. Falcetta receives

5    the other two points are kind of unfortunately connected

6    in time.  It appears that Mr. Falcetta received his fine

7    and the suspension of his drivers license on August 24th,

8    2000, and proceeded presumably that evening to get drunk

9    and go speeding.  And his second conviction, his arrest

10   that led to a second conviction was the same day, same

11   calendar day as his initial sentence.  They didn't take

12   place on the same day but they certainly are connected and

13   in that sense may somewhat overstate the seriousness of

14   the chance of recidivism as well.

15        I would also note in that connection that the

16   only period of incarceration that Mr. Falcetta received as

17   a result of either of those offenses was five days.

18   Otherwise he was simply fined.

19        With those observations, I'd appreciate

20   counsel's comments as to whether this should be a criminal

21   history two or criminal history category one, and I'll

22   tell you I think it's a close call.  I think if I had to

23   assign points here, I might well assign one and-a-half

24   points which would put him right between one and two.  So

25   that any help you can give me on this score would be

1    appreciated.

2        MS. DOOLEY:  Well, Your Honor, as I indicated in

3    our sentencing memo, without frankly any law or

4    discussion, the government does recognize the 2nd Circuit

5    has long recognized this departure and it may very well be

6    within Your Honor's discretion to grant a downward

7    departure on the horizontal axis and we take no position

8    on whether you should exercise that discretion.

9        If, however, you do exercise that discretion and

10   the combination of the two arrests and the probation, we

11   believe that it's appropriate to stop at level two.  I

12   don't believe it's under anything more than a single point

13   will get you to level two, and sometimes that maybe

14   overstates a person's criminal history category as well

15   but I would just note that I have a reversed reading of

16   the fact that he got the second D.W.I. the day that he was

17   sentenced for the first D.W.I.  I think it doesn't bode as

18   well and perhaps makes it more serious or more -- of

19   greater concern the likelihood of recidivism because on

20   the day that he paid over $400 in fine and had his license

21   suspended, he promptly went out driving too fast, was

22   dopey enough to do it after drinking and finding himself

23   in really quite a jackpot.

24        So I would, I would argue were it not for their

25   closeness in time, the temporal proximity suggest they

1    overstate but perhaps that they at least should both be

2    included.  And unsupervised probation, I agree with Your

3    Honor that the violation of that really isn't as

4    significant.

5           So the combination of the unsupervised probation

6    though and the two cases, the government believes that the

7    two categories is more appropriate, should Your Honor

8    exercise your discretion to downwardly depart.

9           MR. DIAMOND:  Just one question, Your Honor.  I

10   believe that with the obstruction of justice as far as he

11   has the right to be pressure bound --

12          THE COURT:  It makes no difference.  As I read

13   the sentencing guidelines, the safety valve is available

14   only when there's one criminal history point.  If I depart

15   horizontally I'm not changing the number of points, I'm

16   changing -- I'm saying that the points overstate the

17   seriousness and, therefore, I'm looking at a different

18   criminal history category but I don't believe it revives a

19   right to the safety valve.

20          MR. DIAMOND:  I wasn't sure about that.  Of

21   course my argument is that with the assessment of an

22   obstruction charge, I think that it would be fair to bring

23   him down to a one, and obviously after being hit with an

24   enormous fine, he went out and got drunk again.  And I can

25   understand that because this was a rather difficult thing

1   for him to live with and I already indicated, Your Honor,

2   that maybe it's not unusual for sailors on leave to drink.

3   And to serve three and-a-half years in the U. S. Navy,

4   that's something that should be taken into consideration.

5   This man has had a blameless record outside of this one

6   solitary apparition for which he may have hoped to

7   make one thousand dollars.

8           THE COURT:  I appreciate --

9           MR. DIAMOND:  If I could add, as a 19th Century

10  criminologist once said, in the case of two sentences, the

11  lesser sentence is always the best.

12          THE COURT:  Well, I think you both make good

13  points.  Ms. Dooley makes an excellent point with respect

14  to the recidivism issue.  I suppose there's one other

15  factor and that is that these are both motor vehicle

16  offenses, although they are serious motor vehicle

17  offenses.  Had Mr. Falcetta done something much more

18  serious and yet been given a short sentence, he still

19  would have gotten a point for each of these two and,

20  again, although I think it's a very close call, I'm going

21  to depart down to a criminal history category one

22  essentially for the reasons I've already stated on the

23  record.

24          All right.  That leaves us with an offense level

25  27, criminal history category one, and the following

1    sentencing guideline range:

2           A period of incarceration of 70 to 87 months, a

3    term of supervised release of four to five years; a fine

4    of 12,500 to two million dollars; and a special assessment

5    of $100.  Do either counsel or the probation office have

6    correction to that statement of the sentencing guidelines

7    range?

8           MS. DOOLEY:  No, Your Honor.

9           MR. DIAMOND:  No.

10          MR. MAXWELL:  No, Your Honor.

11          THE COURT:  Okay.  Mr. Diamond, at this point

12   I'd like to turn to you and have you make your argument in

13   favor of your motions for downward departure as well as

14   any further argument you want to make regarding the

15   appropriate sentence in the case.  Obviously I think

16   you've given us part of your argument already.

17          Mr. Falcetta, once your lawyer has spoken, if

18   you would like, you'll have the right to make a statement

19   as well.  You're not required to but certainly I'll be

20   interested in hearing anything you want to say and then

21   I'll hear from the government.

22          MR. DIAMOND:  I've already indicated, Judge, my

23   own particular feelings about the absence of uniformity in

24   sentencing; the fact that the three or four other

25   individuals in this case had received a sentence --

projected right now, it was almost two to three times what

is projected. I'm sorry. My client would receive a

sentence approximately two to three times more than

Mr. Shaun Evans, and Mr -- I think it's Cole will

practically get nothing.

As I indicated to the court when I first took

this case, and based upon what I considered to be a rather

open and shut case in the sense that my client was guilty

and he immediately plead guilty, with a three point

reduction, he would get a safety valve and he would get a

5K1. However, of interest much more anything else was the

solitary fact that under the rather severe method in which

immigration has viewed aliens or people that came to this

country and didn't have papers, they would automatically

be deported. And I urged Jim Finnerty of the U. S.

Attorney's Office to help me. He agreed and he said he

would write letters and I even called Immigration in

Hartford and we then had discussed this because I was very

concerned that my client would be deported. Why wouldn't

he be deported? Because he came here when he was one year

old from Ecuador. His father was an Italian national who

disappeared. His mother, his brother, his sister, his

wife, his two children were all U. S. citizens, and I

could see that at the end of his sentence this gentleman

could be send back to Ecuador where he knows absolutely

1    nobody. I've indicated there's enormous case law

2    indicating this is a terrible, terrible thing to happen to

3    anybody. Exile is the worst thing that can happen.

4        Now, there were cases, U. S. against Johnson, I know

5    that Judge Weinstein, who's not beloved by many

6    prosecutors, has stated that children are an important

7    factor in any family and to perceive that this gentleman

8    would be sent to Ecuador while his wife and children are

9    here, would not have a husband, could be the type of

10   punishment that is most severe that could possibly happen.

11   It is difficult not to believe that Mr. Falcetta himself

12   would be lost in Ecuador, not knowing anyone there. What

13   was he going to do with his life, split from his family,

14   the enormous tragedy that would happen.

15       I believe this is something that has been recognized

16   and used for a 5K2.0 reduction. I don't know what the

17   exact section is. 5k2.16 or 17, whatever it is, Your

18   Honor, it is very severe. It is the most draconian type

19   of sentence that could possibly be given by any court.

20       Now, it is obvious and I recognize the fact, well,

21   that's not before Your Honor, but it will be before Your

22   Honor two years, three years, four years or five years,

23   assuming he will be incarcerated for that period of time.

24   Then what happens? Should this be factored in now and not

25   later? Should he be given the benefit of the doubt? I

1   believe so.  I believe and I strongly urge that this court

2   depart in the sense that other judges have when you have a

3   family circumstance that is so horrible.  This man is an

4   American, has served in the Navy.  Through some error, his

5   mother didn't take care of the papers properly.  She

6   didn't know what she was supposed to do, for whatever

7   reason.  She did the very best she could.  In 1996, she

8   tried to make him a citizen.  All her other children

9   became citizens.  She is a citizen.  Everyone is a citizen

10  except Mr. Falcetta who served in the Navy for three

11  and-a-half years.  The fact that he elected to do this

12  indicates his feelings about this country.

13      Now, Your Honor can't go and say I'm going to make

14  you a citizen but what the court can do is say you should

15  be entitled to a 5k2.  You should -- this is something

16  that I can take into consideration in reaching a just

17  verdict.  To have a man that's making a thousand dollars

18  on a rather stupid drug deal, agrees to testify against

19  his best friend under enormous coercion, to get a minimum

20  of 70 months in jail I find to be a tragedy, a tragedy for

21  the judicial system, a tragedy for everyone that is in

22  this courtroom.

23      And after 46 years of practice, Your Honor -- when I

24  started, my first case was against Frank Costello.  I

25  wrote a brief for George Wolfe, and Jack Cobb, W.

1     Friedman, George at 160 Broadway, Friedman at

2     170 Broadway.  Gambling cases.  Now we're stuck in drug

3     cases for the last 35 years.  This has been a horrible

4     joke.  It has hurt all of us in our pockets, our families.

5     There are more drugs in Fairfield County than you want to

6     know.  Our children are at risk.  It has been the failed

7     experiment.  No one wants to look at it properly and say I

8     have the courage to stand up and fight against this

9     properly.  And, by the way, I'm not easy.  I think in the

10    very beginning they should have made it a death sentence.

11    You don't go ahead and -- I have to take 12 drugs everyday

12    to stay alive.  I know what it is to take drugs.

13         This is something that shouldn't have happened but

14    don't pick on the low end of the stick and have a Navy

15    veteran sent to jail for 70 months.  It is improper.  It's

16    not right.  I think a 5K2 should be awarded in this case.

17    I think that the result to his family is something that is

18    obvious.  This is the type of departure that Your Honor

19    should seriously consider in the interests of justice.

20         Thank you.  I'm sorry, I'm getting a little bit

21    tired.

22              THE COURT:  All right, thank you.  Mr. Falcetta,

23    do you wish to make a statement today?

24              THE DEFENDANT:  Should I stand up?

25              THE COURT:  Sure.

1    THE DEFENDANT:  Could I touch every subject that
2  was talked about today?
3    THE COURT:  You can say as much or as little as
4  you want to, sir.
5    THE DEFENDANT:  Based on the fact, the testimony
6  I gave on Andre Osorio's case, I did it to the full
7  truthfulness as I could.  I went up there.  To this day my
8  neighbors, they're calling me a snitch, you know?  Why
9  would I pick on somebody that's going to call me a snitch?
10  To this day he goes to my neighborhood and asks about me
11  and they call me a snitch.  I was going to look out for
12  him.  I wasn't looking out for my family, because my wife
13  lives right around the corner where Andre Osorio lives.
14    Mr. Rieny, he's been in my life since I was 11
15  years old.  He was never my school teacher, and he used to
16  spank the kids when they did something bad.  His kids were
17  in school.  He even did it to me and I wasn't from his
18  school, you know?  He just had this pressure on the kids
19  and by growing up, you know, we were like forced to listen
20  to this guy.  And when he told me to sign these papers,
21  you know, it's better off that I sign these papers.  Then
22  I did.  I didn't want anything to happen to my family.  I
23  got two daughters.  You know, I got a wife.  I got a
24  beautiful wife and two beautiful kids.  I don't want
25  nothing to happen to them because of my error, you know?

1          I just drove the car.  Yeah, I was going to make

2    a thousand dollars but that was to pay off a computer bill

3    that we had.  We bought a computer when we were in

4    Norfolk, Virginia that time and that was simply to pay

5    that off.  I was not on -- I was just hired to drive the

6    car.  He went on, you know, Mr. Rieny.  You know, I was

7    under a lot of pressure and the 83rd Street guys, I felt

8    Ms. Dooley opened up my eyes and made me see these guys

9    weren't my friends.  These guys aren't my friends and

10   there we are, 20 years down the drain.  They weren't my

11   friends.  She open my eyes.  As she told me, these guys

12   are not your friends.  You do what you have to do.  I did

13   what I had to do, I hope.  In God's eyes probably I saved

14   my kid's lives, you know?  That's what I said.  But the

15   truth did come out.  Mr. Rieny did do those things to

16   these kids.  Mr. Rieny did pressure me into signing these

17   papers, you know?  Andre Osorio, he pled guilty to some

18   charge and I don't know what it is but it was a drug

19   offense, and the truth did come out, my minor role in it,

20   but I think the truth did come out in everything.

21         I know out of court my friends got lower terms

22   than I'm looking at.  I'm in a different bracket than they

23   are, you know, so I'll accept whatever is given to me, but

24   I don't want that cycle in my life being forwarded to my

25   kids.  I didn't grow up with a father and I don't want my

1  kids growing up without a father, you know.  I was misled

2  by a teacher that wasn't even my teacher and I don't want

3  that happening to my kids, you know.

4       I talk to the kids in jail.  When I was in

5  prison in Wyatt I talk to the kids, telling them not to

6  get into the bad ways of life.  You know, I do a Project

7  Aware thing with the kids so I can tell them not to come

8  in, not even to listen to your friends but to listen to

9  your gut instinct which is to do the right thing, because

10 all through my life I didn't do the right things.

11      That D.W.I. thing, we were so many times out to

12 sea and when we come home, we party.  We work hard and we

13 party hard and I didn't know it was that much of a close

14 thing, that I paid the ticket and I got drunk that day.  I

15 didn't even realize that, to tell you the truth.  You

16 know, if I did pay it -- because we're out to sea a long

17 time and I saved up enough money to pay my rent and have

18 enough money to pay the bills, that the amount they gave

19 me was like 400 dollars, and then we went out drinking.  I

20 don't remember that day.  I only remember driving back and

21 paying the bill but I don't remember getting drunk that

22 day.  Maybe because I was too drunk -- no, it's not

23 because I was too drunk, you know, I don't know -- but I

24 don't know.  I don't think I'm that bad of a person to be

25 given 70 or 87 months.

1    All I did was drive the car, you know.  I

2    introduce Shaun to Rendon and that's all I did.  That's

3    all I did.  I told her everything she needed to know from

4    the beginning, from since I pled guilty, since the safety

5    valve, from the proffer, I told it.  I didn't hold nothing

6    back.  The only thing I held back was when my kids, my

7    wife and my kids left, I never would have known if I went

8    and testified about him, what would have happen to my

9    kids, to protect them, you know?  I don't know what would

10   happen to my kids.  I don't want nothing to happen to my

11   kids, nor nobody else's kids, you know?  I'm not a bad

12   person.

13        Even at Wyatt, everybody knows me.  I don't

14   cause trouble.  I don't do nothing wrong.  One of my

15   closest friends, he tell everybody that I was a snitch.

16   Unfortunately they didn't catch me in the fights that I

17   had at Wyatt because he said that I was a snitch, you

18   know?  He got his 5K1 so that made him a snitch but he put

19   all the heat on me, Judge, because I was small and they

20   could beat me up?  Maybe, I don't know.  But that was the

21   dirty person that placed it on me and I'm just trying to

22   do the same thing you're doing.  I'm trying to get the 5K1

23   for my kids.  You're doing it for your kids or your

24   family, whoever you did it for, you know?  And then you

25   put that heat on me in jail.  But I didn't get in trouble,

1   you know?  I stayed that way, even in jail.  There's a lot

2   of negativity in jail.  I stayed in that right path.  I

3   didn't let nothing get in my way because I want to get

4   home to my kids, you know?

5           If I do get sentenced to five years, ten months,

6   or 87 months, whatever, whatever you sentence me to, you

7   know, I'm not going to be -- I don't know.  This is crazy.

8   I'm not going to come out worse, I'll come out better.

9   Yeah, but I'm already better.  I always been better.  I

10  always been better in all of my court fights.  I went

11  throughout my whole life and never had a drug conviction.

12  I had speeding tickets when I went into the Navy.  I had

13  developed a drinking problem when I was in the Navy.

14  Yeah, I went through peer pressure.  Yeah, it was my

15  fault.  I drank because I wanted to drink and I wanted to

16  have fun.  But, you know, just guys growing up, you know?

17  What guys don't drink growing up, you know?  I didn't -- I

18  drank to the extent I got caught and I got caught again

19  but I don't drink no more.  I don't even smoke cigarettes

20  anymore.  Not because I'm in jail but because I choose not

21  to.  I choose not talk to nobody so I won't have no peer

22  pressure.  I'll just have my pressure and my kids'

23  pressure, you know, hoping the best for them during the

24  time away from them.  That's all.  I don't know what else

25  I can say, Your Honor.  Pray for the best, you know.

1    THE COURT:  All right, thank you.  Ms. Dooley?

2    MS. DOOLEY:  I think it probably would have been

3    nice to practice law when arguments didn't have to be

4    identified by numbers and letters and compartmentalized

5    into bases for downward departure that can be readily

6    identified and concisely articulated.

7         As I understand Mr. Diamond's argument, it is

8    essentially a combination, either independently or

9    combination of factors to include the deportation of

10   Mr. Falcetta as well as the extraordinary impact on his

11   family of not only a period of incarceration but, as well,

12   the deportation.

13        From a factual standpoint I don't disagree with

14   anything Mr. Diamond said in terms of how the case

15   unfolded.  He has from the very beginning indicated that

16   his primary goal was to avoid his client's deportation.

17   Based on my conversations with Mr. Finnerty, it is my

18   understanding that our office, as it always does, which is

19   we don't represent the INS, we can't speak for the INS.

20   This is an aggravated felony.  You certainly have your

21   work cut out for you.  Deportation may be inevitable and

22   completely unavoidable, but consistent with the language

23   in our cooperation agreements, we will at the request of

24   any defendant who has successfully completed his

25   obligation under cooperation write a letter to somebody.

1    And we've written letters to licensing commissions or

2    others, to include the INS when asked and we certainly

3    would have done so here had the defendant not breached the

4    cooperation agreement.

5        This is the hardest part for I think defense

6    attorneys, prosecutors and judges.  There is no question

7    that any young man who stands before the court for

8    sentencing looking at a significant period of time in jail

9    who has young children and a family, the impact is

10    devastating.  It's tragic, it's unfortunate, but it is

11    common, it is typical.  It is not extraordinary.  And

12    while the 2nd Circuit has recognized that there are

13    frankly rare and extreme circumstances where these factors

14    individually or in the aggregate might rise to the level

15    of extraordinary, the government just does not believe

16    that this is such a case, and that the court does not have

17    discretion in this situation to go below the juncture of

18    what is the calculated guideline which is 70 to 87 months.

19        MR. DIAMOND:  I would just indicate that

20    deportation was certainly an extreme measure, and I think

21    that's quite obvious.

22        THE COURT:  All right, thank you.

23        Let me, Mr. Falcetta, just tell you from the

24    beginning that I agree with almost everything both lawyers

25    have just said, and that is I think it's a tragic

1    situation that you are sitting where you are and you have

2    a young family who's going to be separated from you for

3    some significant period of time of incarceration, and

4    after that almost certainly you will be deported.  And it

5    is an all too frequent and unfortunate situation that I

6    find myself in facing someone who has made sometimes a

7    single, sometimes only a couple; in your case it's

8    basically a single bad decision and you're facing a very

9    significant period of incarceration as a result of it.  It

10   was a single bad decision but it was a very bad decision,

11   and as a result, you are facing hard time and your

12   family's going to suffer as well, and I don't enjoy

13   imposing sentence under these circumstances.  I agree with

14   your lawyer that I would prefer a system in which I was

15   not bound as I am bound by the Federal Sentencing

16   Guidelines.  And, frankly, I think I can do a better job

17   than a book of rules and regulations at looking somebody

18   in the eye and evaluating the seriousness of their conduct

19   and making a decision.  But that's not system we're in.

20   The system we're in is one where the Sentencing Guidelines

21   control except in those extraordinary circumstances, those

22   rare circumstances where a departure is warranted, and I

23   acknowledge that in extraordinary circumstances I have the

24   discretion to depart from the guidelines, but I also agree

25   with Ms. Dooley these are not extraordinary circumstances

1   as the Court of Appeals has defined them, and deportation

2   is almost never considered extraordinary.  That is

3   unfortunately a fact that follows from a drug distribution

4   conviction and it's a common occurrence, unfortunately,

5   but that's where we are.

6          I don't want to minimize in the slightest the

7   impact that is going to have on your family.  I can't

8   imagine what it's going to be like for them, but that

9   isn't the standard either.  The cases, the Court of

10  Appeals have made it quite clear that it is an ordinary

11  and expected disadvantage of conviction like this that the

12  family is going to suffer and only in those circumstances

13  such as where there's no care for children or for an

14  elderly or infirm parent has the Court of Appeals

15  determined that judges should exercise their discretion to

16  depart from the guidelines, and this is not one of those

17  cases.  And for that reason, I'm going to deny the motions

18  for downward departure in this case and sentence you

19  within the sentencing guideline range that's been set

20  forth previously.

21         It is my intention to sentence you as follows --

22  and let me say that in deciding the range here, I very

23  much agree with what your lawyer has said.  Actually the

24  factors are not ones that permit in my view exercise of

25  discretion to downwardly depart.  I think they suggest

1    that you should be at the bottom of the guideline range

2    that's been established and that's essentially why I'm

3    going to do this.  It is my intention to sentence you as

4    follows:

5           To a period of incarceration of 70 months, to be

6    followed by a period of four years of supervised release.

7    During the period of supervised release, the mandatory

8    conditions of supervised release set forth in Guideline

9    Section 5D1.3a one, two, four, and 6-B will apply, as will

10   the standard conditions of supervised release set forth in

11   policy statement and Guideline Section 5d1.3c.

12          As special conditions of supervised release, I'm

13   going to order that in the event that you are deported,

14   you shall not reenter the United States without the prior

15   written approval of the United States Attorney General and

16   notification to the United States Attorney's office and

17   the U. S. Probation Office for the District of

18   Connecticut.

19          And, second, that you shall participate in a

20   substance abuse treatment program either as an inpatient

21   or outpatient as approved by the probation officer.  And

22   that program can include testing to determine whether

23   you've used drugs or alcohol.

24          You shall pay all or a portion of the costs

25   associated with that treatment based upon your ability to

1    pay in an amount to be determined by the probation

2    officer.

3        I'm going to waive a fine in this case, based

4    upon my finding that you cannot afford to pay a fine

5    within the guideline range, and I'm required to impose a

6    mandatory special assessment of $100.

7        Do either counsel have any reason why the

8    sentence that I've just outlined should not be imposed as

9    the sentence of the court?

10       MS. DOOLEY:  Your Honor, the government would

11    ask for just one modification with respect to the

12    condition of supervised release, that in the event he's

13    deported he not reenter without written permission of the

14    Attorney General; we would ask that that also read if he's

15    deported or voluntarily leaves or is removed, because

16    there are a number of different mechanisms by which he may

17    actually be deported, under any of them he should not

18    reenter the United States without the written permission

19    of the Attorney General.

20       THE COURT:  Fair enough.  That change is made.

21    Anything further?

22       MR. DIAMOND:  No, Your Honor.

23       THE COURT:  All right.  Mr. Falcetta, the

24    sentence that I just outlined is hereby imposed as the

25    sentence of the court in this case.  The judgment of the

1  court will be prepared for my signature by the Clerk's

2  Office in consultation with the U. S. Probation Office.

3         I'm required to advise you that you have the

4  right to appeal your sentence.  In your plea agreement you

5  entered into a waiver of your right to appeal the sentence

6  or collaterally attack your sentence if it fell within a

7  certain range.  Because it did not fall within that range,

8  your waiver of your right to appeal does not apply and you

9  retain the right to appeal your sentence.  Do you

10  understand that?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  All right.  If you wish to file a

13  Notice of Appeal, you must do so within ten days of the

14  entry of judgment in this case or you will lose your right

15  to appeal.  Do you understand that?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  And if you wish to appeal but cannot

18  afford to do so, you can file a motion to proceed in forma

19  pauperis, and if that motion is granted, the court will

20  waive all filing fees and will appoint counsel to handle

21  your appealing with no cost to you.  Do you understand

22  that?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  All right.  Does the government have

25  a motion?

1          MS. DOOLEY:  Your Honor, at this time the

2    government would move to dismiss Count Two of the

3    indictment as to this defendant.

4          THE COURT:  That motion is granted.  Is there

5    anything further?

6          MS. DOOLEY:  Not from the government, Your

7    Honor.

8          MR. DIAMOND:  None.

9          THE COURT:  All right.  Thank you both.

10   Mr. Falcetta, I would simply want to wish you the best of

11   luck going forward.  I know you have a hard road ahead of

12   you and I hope that you will maintain the attitude that

13   you expressed today.  That is, you're going to do the

14   right thing from now on, and I hope that you and your

15   family are able to rejoin each other as soon as possible

16   and you have my best wishes.

17          We'll stand adjourned.

18          THE DEFENDANT:  Thank you.

19          (Whereupon the above matter was adjourned at 4:50

20   o'clock, P. M.)

21

22

23

24

25

### C E R T I F I C A T E

        I, Susan E. Catucci, RMR, Official Court
Reporter for the United States District Court for the
District of Connecticut, do hereby certify that the
foregoing pages are a true and accurate transcription of
my shorthand notes taken in the aforementioned matter to
the best of my skill and ability.




            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (203) 246-6385